UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

JOHN HOWELL, III.,

                Plaintiff,

v.

DTE ELECTRIC COMPANY,
a Michigan Corporation,

                Defendant.
_____/

Case No. 24-cv-
Hon.

ERIC STEMPIEN (P58703)
STEMPIEN LAW, PLLC
Attorney for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
(734)744-7002
eric@stempien.com

_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, John Howell, III., by and through his attorneys, Stempien Law, PLLC, hereby complains against Defendant DTE Electric Company, and in support thereof states:

1. Plaintiff John Howell, III., ("Howell" or "Plaintiff") is a resident of the City of Atlanta, Georgia and a former employee of DTE Electric.

1

2. Defendant DTE Electric Company ("DTE" or "Defendant") is a Michigan corporation with its principal place of business located in the City of Detroit, Wayne County, Michigan.

3. This Court has subject matter jurisdiction over Plaintiff's claims for race discrimination and retaliation because they arise under federal law, specifically 42 USC §1981.

4. Venue is proper in the Eastern District of Michigan because all parties reside in the Eastern District of Michigan and the events giving rise to the Plaintiff's claims occurred in the Eastern District of Michigan.

## GENERAL ALLEGATIONS

5. Plaintiff Howell is an African-American man.

6. Howell graduated from Port Huron High School in 1991.

7. Prior to his employment with DTE, Howell served in the United States Army, from which he was honorably discharged.

8. Howell began his employment with DTE Energy on December 18, 1999, in the position of cable mechanic.

9. From 2000 to 2017, Howell held the position of Underground Cable Splicer for DTE Energy in the company's Trombly Center Facility in Detroit.

10. In February 2017, Howell was promoted to the position of Frontline Supervisor over Underground lines at the company's Shelby Service Center.

11. In January 2020, Howell was promoted to General Supervisor of the company's Shelby Service Center working for Manager Glen McCoy.

12. In September 2021, McCoy offered and Howell accepted a pilot position as Underground General Supervisor at DTE's Pontiac Service Center.

13. From 2020 until November 2022, Howell reported to Glen McCoy, Manager-Distribution Operations.

14. In October 2022, DTE transferred McCoy to the position of Safety Manager.

15. Jerry Tullio (white male, age 32) took over McCoy's position of Manager - Distribution Operation and became Howell's manager in October 2022.

16. Jerry Tullio is the nephew (by marriage) of the company's CEO, Jerry Norcia.

17. Tullio began his employment with DTE Energy in 2014.

18. Before taking over as Howell's manager in October 222, Tullio worked for DTE Energy as a Data Analyst (2014-2016), Operations Analyst (2016-2017), Strategist (2017-2018), Distribution Leadership Program-Supervisor (2019-2021), and General Supervisor-Electric Dispatch (2021-2022).

19. In the position of Manager - Distribution Operation, Tullio reported to Anna Medina (Director) and Ryan Stowe (VP).

20. Also in October 2022, Markeith Poteat took the position of Director – Regional Customer Operations.

3

21. In 2022, DTE Energy requested approval of a $388 million rate increase from the Michigan Public Service Commission (MPSC).

22. On November 18, 2022, the MPSC rejected this request and approved a rate increase of $30.5 million.

23. On November 23, 2022, the day before Thanksgiving, Tullio directed Howell to cut back the staffing schedule for his line crews in the upcoming days, specifically telling Howell not to schedule workers for full shifts, to cancel capital work, and not to schedule on-call workers.

24. Tullio attempted to justify these directives on the ground that DTE's requested rate increase had been denied by the MPSC, and the company had therefore gone into "lean mode".

25. Howell pushed back on this directive, telling Tullio that company policy was to keep capital work crews and flex workers on schedule through the weekend so there would be coverage available in case of outages.

26. In fact, even while Tullio was directing Howell to cut back on his crews, other service stations were allowed to maintain full crew schedules for the upcoming Thanksgiving holiday and weekend.

27. On or about November 23, 2022, metro Detroit experienced significant storms, resulting in power outages within the area serviced by the company's Pontiac Service Center.

28. The storms and resulting outages created significant staffing problems because workers were not readily available, as they would have been had Tullio not directed Howell to cut back on his staffing scheduling.

29. Howell worked on-call and called different centers, which were fully staffed, requesting assistance in responding to the emergency and to restore power, but crews were busy restoring power to customers in their service territories and could not respond to Pontiac's area until their outages were cleared up.

30. Howell also had to utilize the services of a contract company at greater expense to the company, which extended restoration time to customers.

31. During the outrage and emergency, Tullio and Poteat directed Howell to go to the trouble site and work in the field as a lineman repairing broken power lines.

32. Because Howell was a supervisor, his performances of lineman work work violate the terms of the collective bargaining agreement between the company and its electrical workers.

33. After the outages over the Thanksgiving weekend, one of Howell's subordinates posted a message to social media that was critical of the company's response to the outages.  When Howell learned that this employee had made the post, Howell told him to immediately take down the post.

34. Tuillo falsely accused Howell of directing his employee to make the social media post, and Howell denied doing so because he had not directed the employee to make the post.

35. Tullio seized Howell's work phone and kept it for five days while security looked through it to try and evidence that Howell was responsible for the post.

36. Finding nothing, they returned the phone to Howell.

37. In January 2023, Tullio issued Howell's year-end performance review which included negative performance ratings and baseless criticism of Howell's performance.

38. In January 2023, Howell filed a complaint through the company's Dispute Resolution Program (DRP), stating:

> I am following up with the dispute discussion. It was brought to my attention today that on my REP review that one of my marks was due to Thanksgiving when I was oncall. We had a outage in Pontiac that I was covering. I called every service center to get help to cover the outage. I was told by my Manager Jerry [Tullio] to get a Overhead Crew and for me to go out and perform the work myself with the Overhead crew. I explained to Jerry I'm not qualified to work in the UG URD. Then it was mentioned that I was pushing back to go out to the field once I got a crew. After I got my crew I still had to get the transformer located that was not in stock at Pontiac ware house. I also had to get a contractor to help with transporting and assisting my Underground crew. And this took time because other people got involved that delayed all the progress I made getting a kaltz crew after motor city did not help. It was either at that time go out to the job and continue to delay the job or make continue to make the phone calls to get everything the crew needed. I'm getting blamed for this day but I did my job above and beyond to get the help we needed to restore the customers. I was not the one who made the decision to cancel the oncall

> splicing crews, not bring in splicing crews to work capital works so that we can flex them to trouble when needed or not to fill vacant shifts. All of these decisions were made by Jerry [Tullio] that caused all of the results of Thanksgiving Day. I did everything I could to make everything right.
>
> Jerry also mentioned the discipline I received for trying to hide a accident. In my dispute with that discipline I explained that I did not turn it in on time waiting for the mechanics to give me information on if it was damaged to the truck. I'm getting blamed for hiding a accident after Jerry made the comment to me "to bad we cant hide accidents like we used to" I never hid the accident if I was trying to hide a accident why would I tell the crew to turn the truck into the mechanics immediately that morning. This discipline was not warranted.

39. The company's HR vice president, Diane Antishin, reviewed Howell's dispute resolution complaint and upheld his year-end performance review.

40. Antishin concluded that Jerry Tullio had "coached" Howell on performance problems throughout 2022 but this was not true, as Tullio had not provided Howell any performance coaching.

41. Howell asked Antishin to provide any documentation supporting her assertion that Tuillo had "coached" him, but she could not provide any.

42. Howell reported to the Company's Ethics investigators, including Karen Glussac, that he and other African American employees were treated differently by Tullio, and that Tullio made specific requests and directives for African American employees that he did not make for Caucasian employees.

43. These differences in treatment included directing African American supervisors to spend four hours each day in the field, which is not a required

part of the General Supervisor position and is not demanded of Caucasian supervisors.

44. In addition, Tullio applied different rules for overtime for African American employees in contrast to Caucasian employees.

45. Tullio also took overtime pay away from Howell even though he had worked overtime.

46. On April 11, 2023, the company placed Howell on a Performance Improvement Plan (PIP).

47. The original end date for the PIP was June 26, 2023.

48. The PIP did not identify or describe any specific performance issues or gaps in performance, and instead asserted baseless and generic expectations that were not based in fact.

49. In truth, the PIP had no basis in fact, and Howell clearly informed the company of the factual reasons why the assertions in the PIP, though vague and generic, were false.

50. Howell refused to sign the PIP because the assertions of poor performance were false.

51. In April 2023, Human Resources Manager Brittany Gray told Howell that he should not have been placed on the PIP.

52. Gray informed Howell that the PIP was rescinded and that it was null and void.

53. On May 8, 2023, Diane M. Antishin – Vice President, HR and Chief Diversity and Inclusion Officer, responded to Howell's DRP complaint, which he had filed in January 2023.

54. In her letter, Antishin stated:

    After careful review of the material you submitted, I must tell you, however, that I support your leader's decision on a "Inconsistent Contributor" for 2022. I came to this conclusion for the following reasons:

    - I believe that your 2022 expectations and the desired results for those expectations were clearly communicated to you throughout the year to keep you informed of your leader's expectations, including at the 1:1 Connect discussions and year-end discussions with Management.
    - Finally, your rating of "Sometimes" in all areas of the Performance Summary Leader Input regarding your performance and development that were included in your 2022 evaluation indicate that an "Inconsistent Contributor" is appropriate for this performance period.

55. The company formally re-started Howell's PIP on May 9, 2023, with a scheduled plan end date of August 14, 2023.

56. As with the prior PIP from April 2023, the May 9 PIP included "areas requiring improvement" and "objectives/expectations to be met/measures" that were generic and vague and had no basis in fact.

57. Howell clearly informed the company why the PIP had no basis in fact.

58. Over the next 8-10 weeks, Howell was required to attend weekly meetings under the PIP with Jerry Tullio and Diana Martinez from Human Resources.

59. These meetings failed to reveal any specific performance issues or changes that could be made to bring Howell into compliance with Tullio's expectations.

60. On May 11, 2023, Howell sent an email to Diane Antishin responding to her letter denying his DPR complaint. Howell wrote to Antishin as follows:

> Good morning Diane,
>
> I received my DRP outcome yesterday and its some things that are bothering me….
> Yes my expectations were communicated to me throughout the year by my Manager Glen McCoy and I worked extra hard to always meet or go above my expectations. Jerry did not come to Pontiac s/c until November so how could he know how I performed throughout the year up until he came to Pontiac. I never had a 1:1 connect discussion with Jerry all of 2022. Jerry first week here at Pontiac I had to chase and beg him for a quick sitdown trying to go over some things we were working on as a team throughout the yar and first words out of his mouth "Is Underground stealing OT or are the hours justified". He did not want to talk about anything or positive about what was going on in Pontiac prior to his arrival. I had my one on one's with Glen McCoy throughout the year so why am I being graded on the month of him being here? He does not like me! He has been harassing me since his arrival! He has made numerous false statements about me! I understand that when new management team comes and they want their people around them, he has made it clear that he does not want me her making comments "im not his first round choice" or "one day I may get to trust you". I have asked to be moved, stepped down as GS at Pontiac but it seems like nobody is here to help me or all the other employees in Northwest Region. Jerry never provided any facts on the reason

> why I was scored that way, the only facts he has provided to me and Diana Martinez is "I feel or how we feel". Not one piece of documents showing that im deficient in any of these areas. I thought for my dispute he had provided physical facts that I am deficient in any of these areas not how he feels? So now im on a PIP with half of the items that do not pertain to my role as GS of Pontiac. When someone is put on a PIP isn't it suppose to be in areas they are deficient in? And provide the documents showing that they are deficient?
>
> I have worked for this company over 20 years and Love what I do. But being harassed on my job has been stressing me out. Nobody is trying to help us in the Northwest and people are starting to think that the company will not help us because of who he is being the nephew of Jerry Norcia. I know there has been numerous of ethic and other complaints filed but we have not seen any help our way. The company is always talking about Service keys but they are failing us on "Carring". I am not perfect I make mistakes but I own up to them and make sure I do better the next time, but to be continuously harassed is not fair.
>
> Can we please set up a time today to talk in more detail.
>
> Thank you.

61. Antishin refused to provide Howell with any of the information on which she based her decision.

62. In June 2023, Howell offered to be demoted back to a field position, writing to Jerry Tullio:

> Jerry,
>
> I am writing to officially step down from the General Supervisor position. You have made it very clear I am not the person you want leading the personnel of Underground. Your attitude and most recent disrespect demonstrated toward me during our last

11

> PIP discussion made it very clear you do not appreciate me or my skills in leading Underground. Your expectations for me as General Supervisor of Pontiac are not the same expectations you have for all of the General Supervisors and Supervisors under your leadership. I am asking that you work with [Human Resources] to make this transition as quick as possible.
>
> John Howell

63. Howell sent this email to Tullio as well as to his Director, Markieth Poteat, and to Vice President Joe Musallam. All of them ignored Howell's request.

64. DTE Energy has, by custom and practice, allowed Caucasian supervisors the opportunity to return to the field positions when requested, or in response to asserted performance or disciplinary issues. For example:

   a. In 2022, the general supervisor of overhead John Wagner, from the Company's Pontiac Station, had a meeting with his staff in which he called one of his supervisors the "N-word". He was given the option to either quit or go back to the field. Wagner was allowed to remain employed with the company as a lineman.

   b. Patrick Liaggio, a field supervisor, used his company truck to haul a personal trailer to Northern Michigan, and submitted for and received overtime for the trip. Liaggio merely received a verbal warning and was allowed to self-demote back to a field position.

65. In July 2023, Tullio and Diane Martinez (from Human Resources) called Howell into a meeting and told him that his employment with DTE Energy was terminated. Tullio provided Howell with a termination letter dated July 10, 2023, signed by Tullio.

66. The termination letter asserted as the basis for termination: "Despite repeated efforts to address your performance shortcomings, which included being placed on a Performance Improvement Plan, you have failed to sustain performance at an acceptable level for your position. Consequently, your employment is terminated effective immediately."

67. During the termination meeting, Tullio and Martinez refused to provide Howell with any specific examples or information related to his alleged deficient performance.

68. As a direct result of the adverse treatment alleged in the paragraphs above, Plaintiff has experienced and will continue to experience economic damages including lost wages and benefits and other forms of compensation, past and future.

69. As a direct result of the adverse treatment alleged above, Plaintiff has experienced and will continue to experience non-economic damages including humiliation, mental anguish, outrage, embarrassment and loss of reputation and loss of business expectancy.

## COUNT I
## VIOLATION OF 42 U.S.C. § 1981
## RACE DISCRIMINATION AND RETALIATION

70. Plaintiff hereby incorporates and re-alleges the foregoing paragraphs by reference.

71. Under 42 U.S. C. § 1981, Defendant was obligated to refrain from discriminating against Plaintiff because of his race and from retaliating against Plaintiff because of his complaints of discrimination.

72. In violation of this statutory obligation, Defendant discriminated against Plaintiff because of his race and retaliated against Plaintiff because of his complaints of discrimination.

73. In violation of this statutory obligation, Defendant subjected Plaintiff to a baseless performance improvement plan and terminated Plaintiff because of his race and because of his complaints of race discrimination.

74. Defendant treated Plaintiff differently than similarly situated employees who were not African American and who did not make complaints of race discrimination.

75. In further violation of this statutory obligation, which allowing similarly situated Caucasian employees to return to field work in lieu of discipline or termination, Defendant, because of Plaintiff's race, denied Plaintiff's request to return to field work so that he could continue his career with DTE Energy without being subject to direct discrimination and harassment by Tullio.

76. Defendant denied Plaintiff's request to return to field work despite the fact that it permitted Caucasian co-workers to return to field work, as alleged above.

77. Defendant's assertions of poor performance against Plaintiff are false as a matter of fact and were manufactured merely as a pretext for Defendant's discrimination against Plaintiff because of his race and for Defendant's retaliation against Plaintiff for his complaints of race discrimination.

78. As a direct result of the violation of Plaintiff's civil rights as alleged above, Plaintiff has and will continue to experience lost earnings and benefits; Plaintiff has and will continue to experience emotional distress, humiliation, loss of reputation and mental anguish.

79. Defendant's conduct was willful and malicious entitling Plaintiff to punitive damages.

80. Accordingly, Plaintiff requests the following relief:

    a. An order awarding compensatory damages;

    b. An order awarding punitive damages;

    c. An order of reinstatement;

    d. An order awarding statutory attorney fees and reimbursement of litigation costs; and

    e. An order awarding such other relief the court deems just and equitable.

## COUNT II
## VIOLATION OF ELLIOTT LARSEN CIVIL RIGHTS ACT
## RACE DISCRIMINATION

81. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

82. Howell is a member of a protected class on the basis of his race, African-American.

83. Howell was qualified for the position of General Supervisor at DTE.

84. Howell suffered adverse employment actions, including, but not limited to: poor performance reviews, placement on a performance improvement plan and discharge.

85. Howell was replaced by a person who is not a member of his protected class; alternatively, other similarly situated employees, who are not members of the protected class were treated more favorably than Howell, as set forth in more detail above.

86. One of the motives or reasons for the adverse employment actions taken against Howell was his race.

87. As a direct and proximate result of DTE's violations of Elliott Larsen Civil Rights Act, Plaintiff suffered damages, including, but not limited to: lost past and future wages, lost past and future employment benefits and emotional distress.

## COUNT III
## VIOLATION OF ELLIOTT LARSEN CIVIL RIGHTS ACT RETALIATION

88. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

89. Howell engaged in protected activity when he opposed DTE's violations of the Elliott Larsen Civil Rights Act (ELCRA) by his acts and communications more fully described above.

90. Howell's opposition to the violations of ELCRA were known to DTE.

91. Howell suffered adverse employment actions, including, but not limited to: poor performance reviews, placement on a performance improvement plan and discharge.

92. There was a causal connection between the protected activity and the adverse employment actions taken by DTE.

93. As a direct and proximate result of DTE's violations of ELCRA, Plaintiff suffered damages, including, but not limited to: lost past and future wages, lost past and future employment benefits and emotional distress.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendant, and award him economic and non-economic damages sustained as a direct and proximate result of Defendant's conduct, punitive damages, all other equitable and injunctive relief deemed appropriate at the time of final judgment,

17

together with costs and interest, attorney fees and all other such legal and equitable relief as this court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of the within cause.

STEMPIEN LAW, PLLC

*/s/ Eric Stempien*
By: Eric Stempien (P58703)
Attorney for Plaintiff

Dated: September 11, 2024